**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARY FETZER and EDWARD FETZER,** | ) | |
| **Plaintiffs,** | ) | **Case No. 13 C 9312** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **WAL-MART STORES, INC.,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

On March 5, 2013, plaintiff Mary Fetzer slipped and fell on water on the floor of the

Crystal Lake Wal-Mart store. This diversity case against Wal-Mart Stores, Inc., filed by Ms.

Fetzer and her husband, Edward Fetzer, followed. The parties dispute, among other things,

whether there was water on the floor prior to Ms. Fetzer's fall and, if so, whether it was due to a

roof leak. Wal-Mart has moved for summary judgment on liability. Wal-Mart also has moved to

strike: (1) affidavits from Mr. Fetzer and three individuals who reported falls at the Crystal Lake

Wal-Mart; (2) portions of the plaintiffs' Rule 56.1 submissions; and (3) the affidavit of Daniel

Robison, the plaintiffs' architectural expert witness. For the following reasons, the motion to

strike Mr. Robison's affidavit is granted, the other motions to strike are granted in part and

denied in part, and Wal-Mart's motion for summary judgment is granted in part and denied in

part.

**I.      Motions to Strike Affidavits Submitted by the Plaintiffs in Opposition to Wal-
         Mart's Motion for Summary Judgment**

Before considering the evidence submitted by the parties and Wal-Mart's motion to strike

portions of the plaintiffs' Rule 56.1 submissions, the court considers whether certain affidavits

submitted by the plaintiffs in opposition to Wal-Mart's motion for summary judgment are

admissible.

## A. Wal-Mart's Motion to Strike Daniel Robison's Affidavit

Wal-Mart moves to strike an affidavit (not an expert report) submitted by the plaintiffs' expert witness Daniel Robison, who is an architect.

### 1. The Contents of Mr. Robison's Affidavit

In his affidavit, Mr. Robison states that the roof of the Crystal Lake Wal-Mart has a TPO single-ply roof membrane system and opines that TPO membranes are "susceptible to punctures and leaks" and are "widely known in the commercial roofing industry, prior to this roof installation, to be likely to experience many problems including[] premature deterioration, easy puncturing, tearing and failure in shorter periods of time than other common commercial roofing materials."[1] (Dkt. 216-1 ¶ 9.) Mr. Robison criticizes multiple aspects of Wal-Mart's roof maintenance and opines that the "roof membrane system failed in its primary function." (*Id.* ¶ 13.)

He states that "[l]eaks can drip at varying rates from very slowly to very rapidly" and that "[l]eaks can appear and reappear at different places and different times, even if they originate from the same source." (*Id.* ¶¶ 39-40.) In addition, he opines that the polished concrete floor at the Crystal Lake Wal-Mart "is dangerously slippery when wet" and is "not reasonably slip resistant for its intended use under its foreseeable conditions." (*Id.* ¶¶ 24, 31.) Specifically:

> Wal-Mart's leaky roof dripping water onto the polished concrete floor surface created a dangerous slip and fall hazard to its customers. Because of the number of roof leaks at the Store, it was reasonably foreseeable that the polished concrete floor would be wet from time to time during periods of occupancy. Because the floor would be wet when customers were present, according to nationally

---

[1] TPO is an abbreviation for thermoplastic polyolefin. *See* http://www. everybodyneedsaroof.com/thermoplastic-membranes (the website of the National Roofing Contractors Association, last visited March 1, 2016).

published standards for safe facilities, Wal-Mart had an obligation to make sure that the flooring was adequately slip resistant. Wal-Mart failed to maintain safe walking surfaces under the known wet conditions caused by the leaky roof. It failed to effectively respond to the known dangerous condition.

(*Id.* ¶¶ 35-38.)

In addition, Mr. Robison states that he "know[s] where Mary slipped and fell because it is shown on Wal-Mart's security video that [he] watched." (*Id.* ¶ 2.) He then relates details from a visit to the Crystal Lake Wal-Mart in December 2014 to view the area where Ms. Fetzer purportedly fell. Attorneys for the parties in this case and Shawn Schipp, a Wal-Mart asset protection manager, were also present. Robison states that he:

> observed multiple drops of water in the Pharmacy over-the-counter area, [the] action alley adjacent to the Pharmacy's over-the-counter section, and in other locations including the aisle where Mary slipped and fell. Mr. Schipp walked past and ignored the water that was on the polished concrete floor in the Pharmacy's over-the-counter section. No Wal-Mart employee took any steps to find, identify, guard, mark, or warn of water on the polished concrete floor during my site inspection. According to deposition testimony, the floor was in the same condition on March 5, 2013 when Mary Fetzer slipped and fell as it was on the day of my site inspection testing.

(*Id.* ¶¶ 20-23.)

## 2.     Legal Standard

With respect to Mr. Robinson's affidavit generally, an affidavit submitted in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The plaintiffs appear to want to offer Mr. Robison as a lay witness (to testify about what he observed during his site visit and his lay opinions about those observations) and an expert (to opine about Wal-Mart's roof and the floor in the area where Ms. Fetzer fell).

To the extent that the plaintiffs are offering Mr. Robison as a lay witness, he may testify about matters within his personal knowledge. *See id.*; *see also* Fed. R. Evid. 602. A lay witness may also testify about opinions or inferences if they are "(a) rationally based on [his] perception; (b) helpful to clearly understanding [his] testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; *see also Tribble v. Evangelides*, 670 F.3d 753, 758 (7th Cir. 2011) (quoting *United States v. Conn*, 297 F. 3d 548, 554 (7th Cir. 2002) (a lay witness may "not provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events")).

To the extent that the plaintiffs are offering Mr. Robison as an expert witness, the plaintiffs must provide an expert report. *See* Fed. R. Civ. P. 26(a)(2)(B) (a party must provide an expert report for "a witness who is retained or specially employed to provide expert testimony in the case"). The expert report must contain: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." *Id.*

Turning to the substance of Mr. Robison's expert opinions, Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the

admissibility of expert testimony in federal court. *See Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert*, this court must function as a "gatekeeper" to "ensure the reliability and relevancy of expert testimony." *Naeem*, 444 F.3d 607 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). "To do so, the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (quoting Fed. R. Evid. 702)). The court must also determine if an expert is offering legal conclusions, as "experts cannot make those." *See United States v. Diekhoff*, 535 F.3d 611, 619 (7th Cir. 2008).

### 3.    Wal-Mart's Motion to Strike

Wal-Mart contends that Mr. Robison's affidavit is improper because it does not contain all of the information that must be in an expert report and fails to rely on specific and sufficient underlying facts and data. Wal-Mart also argues that portions of the affidavit rely on inadmissible hearsay, lack foundation, contain allegations that are outside Mr. Robison's personal knowledge, are speculative, and assert improper legal conclusions.

Mr. Robison's affidavit suffers from numerous infirmities. The court will highlight a few; the following problems are merely illustrative. First, Mr. Robison represents that he knows "where Mary slipped and fell because it is shown on Wal-Mart's security video that [he] watched." (Dkt. 216-1 ¶ 2.) Mr. Robison's assertion that the security video showed the location where Ms. Fetzer fell is inconsistent with prior protracted proceedings before the magistrate judge regarding the security video.

Due to what the magistrate judge eloquently characterized as "oddly differing accounts of what the action alley camera depicted," the magistrate judge required the parties to conduct a second site visit featuring a tester to determine the areas of the pharmacy captured by the video camera. (Dkt. 196 at 9.) After this "forced exercise," the plaintiffs "acknowledged that the action alley camera footage did not show the location where Ms. Fetzer was standing when she fell, just as Defendant had repeatedly stated." (*Id*. at 10-11.) The magistrate judge held that "[i]t is now clear that despite repeated representations by Plaintiffs' counsel to the contrary, including a questionable affidavit from a forensic expert, the surveillance camera identified by Plaintiffs' expert would not have captured any footage of Ms. Fetzer falling or footage of water on the floor before the fall. Nor would the camera even have captured far less probative footage of her head after the fall." (*Id*. at 12.)

The plaintiffs assert that the security video nevertheless allowed Mr. Robison to ascertain where Ms. Fetzer fell because it "show[s] the end of a small aisle where Mary can be seen shopping, followed by Wal-Mart personnel rushing into that aisle after apparently hearing a noise. It then shows them making phone calls, talking and milling about, and looking

concernedly into the same small aisle. It is abundantly clear from the video that Mary is located in that aisle, even though she cannot be physically seen slipping on the floor." (Dkt. 242 at 2.)

Counsel's gloss on Mr. Robison's statement does not alter the fact that he stated that he knows where Ms. Fetzer fell "because it [*i.e.*, the fall] is shown on Wal-Mart's security video." (Dkt. 216-1 ¶ 2.) Contrary to the explanation provided by plaintiffs' counsel, Mr. Robison does not say that he inferred what aisle Ms. Fetzer fell in based on the video. Speculation about Ms. Fetzer's exact location and imprecision regarding the extent of his knowledge about where Ms. Fetzer fell means that he cannot provide a lay opinion that "[a]ccording to [unspecified] deposition testimony, the floor was in the same condition on March 5, 2013 when Mary Fetzer slipped and fell as it was on the day of my site inspection testing." (Dkt. 216-1 ¶¶ 20-23.) *See Visser v. Packer Engineering Assoc., Inc.*, 924 F.2d 655, 659-60 (7th Cir. 1991) ("[I]nferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.").

Next, Wal-Mart does not challenge the admissibility of Mr. Robison's statement that he saw water on the floor of the pharmacy section on the day of his site visit. It correctly notes, however, that Mr. Robison lacks foundation to testify that Wal-Mart employee Shawn Schipp "ignored" that alleged water because Mr. Robison's affidavit does not cite to any evidence supporting an inference that Mr. Schipp saw the alleged water and then failed to act. (Dkt. 216-1 ¶ 21.) Mr. Robison's speculation about what Mr. Schipp saw is not admissible evidence and thus is not properly before the court in connection with Wal-Mart's motion for summary judgment. *See Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 976 (N.D. Ill.

2014) ("speculation and conjecture" in an affidavit or declaration "cannot create a material issue of fact").

In addition, to the extent that the plaintiffs offer Mr. Robison as an expert, his affidavit does not include any of the information required by Fed. R. Civ. P. 26(a)(2)(B).  He repeatedly renders so-called expert opinions about critical issues in the case (*e.g.*, Wal-Mart's floor is unreasonably slippery, Wal-Mart's leaky roof dripped water on the floor and created a dangerous hazard, and Wal-Mart failed to respond to a known dangerous condition).  But even setting aside the lack of an expert report, he does not articulate "the basis and reasons" for his opinions or identify the specific the facts or data he considered.  *Id*.  Instead, the court and Wal-Mart are left to guess about these critical points.  Presumably, the opinions (which are presented as ipse dixit) are based on some sort of evidence, such as unspecified roof repair records (which Wal-Mart claims all lack foundation).  However, the court cannot ascertain which records relate to each opinion or how the unspecified records show that Mr. Robison is not merely speculating that a roof leak caused water to drip on the floor where Ms. Fetzer fell (to the extent that he can pinpoint the location, which does not appear to be the case).

Similarly, Mr, Robison does not provide any information about his qualifications.  He states that he is a licensed architect.  But how does that make him qualified to render opinions about the slipperiness of wet floors, the suitability and maintenance of roofing membranes, and Wal-Mart's practices when faced with signs of a roof leak?  Does Mr. Robison have any practical or educational experience that would allow him to provide a reliable opinion in any of these areas?  Has Mr. Robison authored any relevant publications?  What methodology, if any,

did Mr. Robison use to reach his conclusions?  What evidence demonstrates that the methodology, if any, is scientifically reliable?

The plaintiffs brush these questions aside by stating that Wal-Mart could attempt to challenge Mr. Robison's credibility in a deposition, file a *Daubert* motion, or cross-examine him at trial.  The plaintiffs, however, are offering his affidavit in opposition to a summary judgment motion.  They have made no effort to address even the most basic requirements under *Daubert*, such as identifying Mr. Robison's methodology and stating whether it can be or has been tested, its known or potential rate of error, and its level of acceptance within the relevant community. *See Gayton v. McCoy*, 593 F.3d 610, 615 (7th Cir. 2010).  Moreover, the various factors that *Daubert* suggests a court use in assessing an expert's methodology all involve a "theory," but no discernible theory underlies Mr. Robison's conclusions.  *See Coffee v. Menard, Inc.*, No. 13 C 2726, 2015 WL 1399049, at *3 (N.D. Ill. Mar. 25, 2015) (excluding expert testimony submitted in opposition to a motion for summary judgment as unreliable).

In a nutshell, Mr. Robison's so-called expert opinions are improper because he has not shown that he is qualified to offer expert testimony or that his expert opinions are properly supported.  Thus, he is not "competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4). To the extent that Mr. Robison is offering a lay opinion about his purported viewing of water during his site visit, he has failed to point to admissible evidence (as opposed to speculation) suggesting that the water he allegedly saw is was in the same place and had the same source as the water that Ms. Fetzer allegedly slipped on.  He has also not addressed whether the passage of time between Ms. Fetzer's fall and the water he allegedly espied during his site visit renders his

testimony about water seen during the site visit irrelevant.  For all of these reasons, Wal-Mart's motion to strike Mr. Robison's affidavit is granted.

### B.    Wal-Mart's Motion to Strike Affidavits from Mr. Fetzer and Three Individuals Who Reported Falls at the Crystal Lake Wal-Mart

Wal-Mart next moves to strike the affidavits of Michelle Moore (Dkt. 212-1), Katie Aulwes (Dkt. 212-3), Stephen Robinson (Dkt. 212-5), and Edward Fetzer (Dkt. 212-7), which the plaintiffs submitted in opposition to Wal-Mart's motion for summary judgment.

Ms. Moore states that on December 13, 2010, she was shopping at the Crystal Lake Wal-Mart.  Her daughter, Emma, fell on a "large puddle of water" located "in the main aisle that leads up to the pharmacy pick-up windows."  (Dkt. 212-1 ¶¶ 5, 8.)  Ms. Moore and Emma could not see the puddle, which was not marked off by cones or signage, before Emma's fall.  Emma fell a second time on March 22, 2015, when she stepped from the wood floor of the men's clothing department onto the concrete floor.

According to Ms. Moore, she has seen plastic buckets collecting dripping water on "many occasions" at the Crystal Lake Wal-Mart, primarily in the north half of the store; more specifically, she has seen water at least ten times in the eighteen months before the date she signed her affidavit (April 27, 2015).  (*Id*. ¶¶ 12-15.)  Ms. Moore believes that the "[t]he floor is slippery even when dry."  (*Id*. ¶ 16.)

Ms. Aulwes's affidavit summarizes her son's December 5, 2009 fall in the grocery department due to an unmarked "puddle of water" that "looked like a puddle of water that had dripped from the roof."  (Dkt. 212-3 ¶¶ 8-11.)  Ms. Aulwes believes that the floor was "extremely slippery, especially in the wet puddle."  (*Id*. ¶ 12.)  After the 2009 fall, Ms. Aulwes continued to shop at the Crystal Lake Wal-Mart, where she noticed "water leaking from the roof

several times," sometimes in areas marked with cones or signs, sometimes without. (*Id.* ¶¶ 20-23.) She believes that the floor is "always slippery, and dangerously slippery when wet." (*Id.* ¶ 24.)

Stephen Robinson is another Crystal Lake Wal-Mart patron with a child who fell during a shopping excursion. Mr. Robinson's daughter, Delaney, fell on July 24, 2010, due to an unmarked puddle of water in "the main aisle in front of the pharmacy heading towards the front cash registers." (Dkt. 212-5 ¶ 7.) After the fall, Mr. Robinson noticed that the puddle was caused by water dripping from a ceiling beam. Mr. Robinson states that "[t]he floor was as slippery as ice where it was wet." (*Id.* ¶ 20.) During the July 24, 2010 shopping trip, Mr. Robinson noticed other drips caused by roof leaks, some of which were collecting in buckets, and some of which were not marked off.

Mr. Robinson states that after Delaney's fall, an unnamed Wal-Mart employee told him that she "was not surprised that there was a leak, accumulated water on the floor[,] or that Delaney had slipped in said water." (*Id.* ¶ 32.) During subsequent trips, Mr. Robinson saw buckets collecting water and water landing directly on the floor, some of which were marked with cones or signage. Mr. Robinson believes that "[t]he polished concrete floor . . . is terribly slippery when wet. It is a very bad and dangerous set up"; "[t]he entire polished concrete floor . . . is slippery." (*Id.* ¶¶ 40-41.)

Edward Fetzer, Ms. Fetzer's husband, also submitted an affidavit. (Dkt. 212-7.) Mr. Fetzer attached photographs and video clips of water to his affidavit.[2] Like Mr. Robison, he

---

[2] It is unclear whether all of the photographs and what appears to be cellphone video clips depict water emanating from the ceiling/roof. For example, one of the video clips pans briskly from water on the floor to a skylight; while the skylight is on the ceiling, the court could

states that he knows where Ms. Fetzer fell because he viewed the security camera footage. Mr. Fetzer believes that the store's "polished concrete floor is very slippery when dry, and extremely slippery when wet." (*Id.* ¶ 11.)

"On many occasions," he observed water coming from roof leaks on the floor of the Crystal Lake Wal-Mart; he "knew the water was from roof leaks because of the distinct clustered pattern of water drops" and because the water was "consistent with other roof leaks [he had] observed and inconsistent with any other source . . . such as spills or tracked in water from shoes." (*Id.* ¶¶ 4-5.) The water he observed remained "unguarded, unmarked, and unprotected for several minutes, as long as 10 minutes." (*Id.* ¶ 13.) In addition, on "several occasions," Mr. Fetzer observed water from roof leaks in the pharmacy section, as well as the cough and cold aisle where Ms. Fetzer fell. He asserts that "[o]n many of the above described occasions," Wal-Mart employees ignored the water. (*Id.* ¶ 9.)

### 1. Lack of Personal Knowledge

Wal-Mart contends that Ms. Moore, Ms. Aulwes, and Mr. Robinson have no basis for opining that their children fell from water caused by a roof leak, and that Mr. Fetzer has no basis for believing he saw water that was caused by roof leaks during some of his visits to the Crystal Lake Wal-Mart. Ms. Moore did not identify the source of the water that caused her daughter's fall, although the inference is that the water is from a roof leak given that she states that she saw dripping water coming from above on other occasions. Ms. Aulwes opined, without explanation,

---

not detect any falling water. Another clip pans from water on the floor to a distant window located on what appears to be an exterior wall; it is unclear how this is meant to show water that is coming from the roof. Regardless, the court will accept the statements in Mr. Fetzer's affidavit at their face value as the plaintiffs are opposing a motion for summary judgment.

that the water that caused her son to fall "looked like a puddle of water that had dripped from the roof." (Dkt. 212-3 ¶¶ 8-11.) Mr. Robinson stated that the puddle his daughter fell on was caused by water dripping from a ceiling beam. Mr. Fetzer believes that he saw water from roof leaks "because of the distinct clustered pattern of water drops" and because the water was "consistent with other roof leaks [he had] observed and inconsistent with any other source . . . such as spills or tracked in water from shoes." (Dkt. 212-7 ¶¶ 4-5.)

Wal-Mart argues that this testimony shows that the affiants lack personal knowledge to conclude that roof leaks were responsible for the water that they saw. Witnesses may testify about matters within their personal knowledge. Fed. R. Evid. 602. Regardless of the weight of the lay opinions about the source of the water, the affiants have given reasons for their assertions that roof leaks caused the water that they saw. Thus, their opinions about the source of the water are not speculative. Wal-Mart's criticisms of these reasons can be addressed via cross examination, but the court will not strike this evidence.

### 2. Floor Slipperiness

The four affiants' opinions about floor slipperiness are addressed below in connection with the plaintiffs' argument that Wal-Mart is liable because it chose a dangerously slippery flooring material (polished concrete) that became even slippier when wet.

### 3. Comments Allegedly Made to Customer Stephen Robinson by an Unspecified Wal-Mart Employee

The court will not consider Mr. Robinson's statements about his conversation with an unspecified Wal-Mart female employee said on July 24, 2010. His recitation of the statements made by this employee are inadmissible as they are being offered for the truth of the matter

therein and the plaintiffs have not identified an exception to the hearsay rule that would make the statement admissible. Fed. R. Evid. 801(c).

### 4. The Basis for Mr. Fetzer's Statement About the Location of Ms. Fetzer's Fall

Mr. Fetzer's statement that he knows where Ms. Fetzer fell because he watched the surveillance video suffers from the same defects as Mr. Robison's testimony to this effect. The court will not consider this portion of his testimony.

For these reasons, Wal-Mart's motion to strike the affidavits is granted in part and denied in part.

### C. Wal-Mart's Motion to Strike Portions of the Plaintiffs' Rule 56.1 Submissions

Wal-Mart seeks to strike large portions of the plaintiffs' Rule 56.1 submissions. Its main point – that the plaintiffs' denials are frequently supported by citations to evidence that does not demonstrate that a genuine issue of fact exists – is well taken. For example, Wal-Mart asserts that its employees conduct safety sweeps, which require the employees to inspect the floor in their work area to look for dangerous conditions, such as water or merchandise lying on the ground. The plaintiffs attempt to create a dispute about the safety sweeps by pointing to numerous deposition transcripts of various Wal-Mart employees. (Pls.' Resp. to ¶ 30 of Def.'s Facts.) While the wording used by the employees differs, it is clear that employees generally were required to, as pharmacy technician Fabiola Escobar put it, "look for things on the floor and

pick them up" and watch for spills and either clean them up or summon help.  (Def. Ex. C,

Escobar Dep., at 30.)[3]

This example is illustrative; to the extent that the plaintiffs' denials of any of Wal-Mart's

facts cite to unresponsive evidence, the court will not consider them.  *See Roberts v. Advocate*

*Health Care*, No. 14 C 442, 2015 WL 4719897, at *1 (N.D. Ill. Aug. 7, 2015) ("The court will

disregard all denials of facts by [the plaintiff] that are fairly supported by the cited evidence.").

Similarly, to the extent that the plaintiffs' denials are evasive, Wal-Mart's corresponding facts

---

[3] The remainder of the string cite provided by the plaintiffs similarly fails to refute Wal-Mart's statement of fact. S*ee* Def. Ex. C, Escobar Dep., at 31 (Ms. Escolar "constantly performed safety sweeps in her area; Def. Ex. F, Ana Canaki Dep, at 31-35 (pharmacy tech Ana Canaki states that Wal-Mart used the intercom to ask associates to inspect their areas every hour, she generally did this and also inspected the areas where she "was walking around"; if a spill is detected, "you basically guard the area and depending on how large the spill is, you – you can either take care of it yourself or you can call for help"); Def. Ex. G, Opland-Reidel Dep., at 22-25, 35-36 (all employees must be "cognizant of any water that's on the floor or any slip-and-fall hazard" and if spills are found, must guard them and clean them themselves or summon help; he did not carry a towel in his pocket because he was a pharmacist but his subordinates carried towels; Wal-Mart announced safety sweeps over the intercom every afternoon; he did not recall whether he observed co-workers performing safety sweeps on the day of Ms. Fetzer's fall); Def. Ex. I, Brown Dep., at 63-65 (employees perform a daily safety sweep with a dust mop pursuant to an intercom announcement, as well as call for clean-up help as needed and follow the "towel in pocket" program; employees perform thrice-daily sweeps between 11:00 a.m. and 8:00 p.m. using a dust mop, plus additional sweeps "any time we see something on the floor in any part of the store"); Def. Ex. K, Levernier Dep., at 31-32 (throughout the day, associates look for anything on the floor, such as merchandise or a spill, that could pose a safety hazard, and associates perform sweeps approximately ten times a day pursuant to announcements on the intercom); Def. Ex. M, Abed Dep., at 47-49 (safety sweeps are announced once or twice a day but over the counter pharmacy merchandise manager Margaret Abed "is very meticulous about picking things up" and "walk[s] the floors all day"; employees guard any spills that they discover and call for help and safety cones); Def. Ex. P, Weger Dep., at 111 (manager William Weger did not recall if he was working at the Crystal Lake Wal-Mart on the day of Ms. Fetzer's fall and did not recall if he observed any employees perform safety sweeps); Def. Ex. Q, Bryant Dep., at 47-48 (pharmacy manager Thomas Bryant is aware of Wal-Mart's safety sweep program but does not always hear the announcements from his work station behind the pharmacy counter; he walks the department each morning to review the merchandise and check for hazards and would call for help if he found any hazards).

are deemed admitted. *See Cardoso v. Cellco P'ship*, No. 13 C 2696, 2014 WL 6705282, at *2 (N.D. Ill. Nov. 26, 2014). Moreover, legal arguments in Rule 56.1 submissions are improper so the court will disregard legal arguments and conclusions in the plaintiffs' Rule 56.1 submissions. *See, e.g.*, *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008).

However, objections to statements of fact based on relevance are inappropriate" so Wal-Mart's relevance objections are overruled. *See, e.g.*, *Antech Diagnostics, Inc. v. Downers Grove Animal Hosp. & Bird Clinic*, P.C., No. 12 C 2736, 2013 WL 773034, at *1 (N.D. Ill. Feb. 28, 2013). "The court will consider facts it deems relevant provided they are supported by the record." *Id*. Finally, to the extent that Wal-Mart seeks to strike portions of the plaintiffs' Rule 56.1 submissions based on arguments made in its motion to strike affidavits from Mr. Robison, the three shoppers, and Mr. Fetzer, Wal-Mart's motion to strike is denied as duplicative.

For these reasons, Wal-Mart's motion to strike portions of the plaintiffs' Rule 56.1 submissions is granted in part and denied in part. With these rulings in mind, the court turns to the parties' Rule 56.1 submissions.

## II. Background

The following facts are drawn from the parties' Rule 56.1 submissions and are undisputed unless otherwise noted.

### A. The Slip and Fall Incident

#### 1. Ms. Fetzer's Fall

The pharmacy department is located by the Crystal Lake store's Home and Pharmacy entrance. It has a drop-off window and a pick-up counter for prescriptions, as well as aisles with

over-the-counter medication.  There is no skylight over the cough and cold aisle, which is near the pharmacy pick-up counter.

At approximately 7:40 p.m. on March 5, 2013, Ms. Fetzer arrived at the Crystal Lake Wal-Mart to pick up a prescription.  It was snowing outside and had snowed for most of the day.  Ms. Fetzer entered Wal-mart using the pharmacy entrance and walked directly to the pharmacy pick-up counter, where she learned that her prescription was not ready.  Ms. Fetzer began to browse the pharmacy department as she waited for her prescription.

Ms. Fetzer fell.  Pharmacy technician Fabiola Escobar heard "a slam, a big slam."  (Def. Ex. C, Escobar Dep., at 50.)  Ms. Escobar left the pharmacy counter to investigate and walked to an aisle in the pharmacy department, where she saw Ms. Fetzer lying on the floor in a "puddle of blood."  (*Id*. at 51.)

Pharmacist Randy Opland-Reidel and pharmacy technician Ana Cakani were also working on the night of Ms. Fetzer's fall.  Mr. Opland-Reidel heard a "loud thump."  (Def. Ex. G, Opland-Reidel Dep., at 37.)  He looked up, saw Ms. Fetzer lying on the floor in the cough and cold aisle, called in a "Code White" to summon help, and walked over to where Ms. Fetzer was lying.[4]  Ms. Cakani also went to the cough and cold aisle after hearing a "loud thump," and saw Ms. Fetzer lying on the floor.  (Def. Ex. F, Cakani Dep., at 42.)  Co-Manager Terry Brown, Assistant Manager Jeff Lerette, now-former Assistant Manager Tabatha White, and Asset Protection Associate Tiffany Levernier responded to the "Code White" and found Ms. Fetzer lying on the floor in the cough and cold aisle.

---

[4]  According to pharmacist Opland-Reidel, a "Code White" alerts management to a customer or associate accident in the store.  (Def. Ex. G, Opland-Reidel Dep., at 26-27.)

## 2.     Wal-Mart Employees' Testimony

Wal-Mart did not receive any complaints of water or requests for clean-up in the cough and cold aisle prior to Ms. Fetzer's fall on March 5, 2013.  Over-the-counter pharmacy manager Margaret Abed, pharmacist Thomas Bryant, and the seven employees who reported to the scene after Ms. Fetzer's fall were not aware of any ceiling leaks by the cough and cold aisle before the fall.  The seven employees who reported to the scene did not see water on the floor near Ms. Fetzer's body, dripping water coming from above, or any merchandise or foreign objects that might have caused the fall.

Former assistant store manager Tabatha White did not believe that the roof was leaking in the pharmacy area on the night of Ms. Fetzer's fall, although she was aware of leaks in this area on prior unspecified dates and had seen a leak in the pharmacy section "shortly before the day" that Ms. Fetzer fell.  (Def. Ex. H, White Dep., at 205.)  In April 2013, there was a leak from the skylight in the Pharmacy section above the merchandise shelf containing Prilosec medication.  The shelf containing Prilosec is on the opposite side of the pharmacy waiting area, 25 feet away from the cough and cold aisle.  The over-the-counter pharmacy manager reported the leak to a manager who was walking the store that morning, and Wal-Mart made arrangements for a repair.

Pharmacy Technician Fabiola Escobar cleaned the blood after Mr. Fetzer's fall.  Before she did so, she did not see water or anything on the ground that might have caused Ms. Fetzer's fall.  Assistant store manager Jeff Lerette worked twelve hours after the fall. During the remainder of his shift, Mr. Lerette did not observe any drips from the ceiling in the cough and cold aisle and he did not need to set out a bucket or garbage can in the aisle due to dripping.

Asset Protection Manager Shawn Schipp toured the cough and cold aisle the day after the fall to ensure that the area had been cleaned properly and to determine if any liquid was on the floor. He did not discover any liquid; the floor was dry and he did not observe any leaks.

### 3.    The Paramedics' Testimony

Paramedics Brian Marino and Adam Bucheger responded to the 911 call placed after Ms. Fetzer's fall was discovered.  The paramedics were focused on Ms. Fetzer's condition but Mr. Marino did not believe that there was "anything remarkable" about the condition of the floor where Ms. Fetzer had fallen.  (Def. Ex. E, Marino Dep., at 81.)  Mr. Marino believes there was probably some water or liquid in the vicinity of Ms. Fetzer but could not say if the paramedics had tracked it in, given the snowy conditions, or if it was already there.  Similarly, Mr. Bucheger could not recall seeing water on the floor.  Neither paramedic saw any broken bottles or containers on the floor.

### 4.    Ms. Fetzer's Testimony

Ms. Fetzer could not immediately recall her fall on March 5, 2013.  Approximately four months later, she mentioned "circles" to her family.  In September 2013, during a conversation with her daughter, Ms. Fetzer recalled remembered that "circles" meant perfectly circular shapes of water.  At this time, she recollected that prior to her fall:

> I'm walking, and I'm just browsing, and I saw an item – I can't even remember what it was, but I remember seeing something on the lower shelf, and I remember picking it up, and I was thinking about buying it.  And as I'm looking at it I heard a like "spts," [sic] like a splat on the floor.  And I thought, you know, what was that.  And I looked at it, and I thought, you know, I'm not going to get this, I'm just going to get my prescription and go home because the weather, my husband is going to get, you know, worried.

> So I put it back, and as I'm standing up I see a raindrop hit the floor in front of me, and next to it are these circular shapes of water.  And I know what water

-19-

looks like. It was clear, but they were perfectly circular shaped – some were big, some were smaller, and where the raindrop that – I heard one, didn't see it, but the second one I know came from up because I saw it fall, hit the floor, and it hit where the circles were, and that was what was making these, and it depends on where they were falling which was creating these circles. And they were perfectly shaped circles.

But as I'm looking at them, I look and I noticed I was – not only were they spread, but I was – they were up to my feet, which I was standing in it, so I – and this was, like, seconds, I'm not even thinking of analyzing and – it just was like two seconds, and I just thought, I'm going to take a step over the circles.

So when I went to take a step over it, I remember my shoe went like this, slipped just like that, and that's the last thing I remember.

(Def. Ex. D, Mary Fetzer Dep., at 194-95.)

Ms. Fetzer then repeated that she saw the water on the floor before she fell and tried to step over it immediately before her fall; "I got myself in it without even realizing, so I had to get myself out of it." (*Id*. at 196.) She explained that she did not see the water on the floor when she first walked down the aisle because "I wasn't that far. I was looking at everything on the shelf. I wasn't looking until I got to almost the end of the aisle." (*Id*.) She believed that the store had adequate lighting.

With respect to the source of the water, Ms. Fetzer testified that:

The water was coming from the roof because I heard the first drop. I know what a splat to the floor sounds like. I didn't see it because I had my back putting something back, but the second time I saw very quickly, not – I didn't see where it came from, but it came down from above, and it landed right near the circles, and that's what was creating where the drops were landing, whether they were large or small.

(*Id*. at 198.)

While she was in the cough and cold aisle, she heard a drop fall on the floor and then saw a second drop fall onto the floor. In response to the question, "When you saw the second drop

fall on the floor, where was it in relation to you?  Was it in front of you?  To the right?  To the left?  Behind you?"  Ms. Fetzer replied.  "It was – all the circles were, like, in front of me, to the right, and obviously I was standing on them, and this was right in front of me because I saw it land.  And it landed in one of the puddles making it go larger."  (*Id*.)  Ms. Fetzer believed that the drop "came from somewhere above."  (*Id*. at 205.)  She testified:

> I didn't look up because I was looking at the circles, but it landed in another circle, and that's how I knew it was water because that's what was making the water circles.  And I was looking at them, and they were the most perfect different size circles, but as I'm looking at how many, I realized that they were everywhere, and they were by my feet.

(*Id*.)  Ms. Fetzer did not look up after she detected the water drops because the ceilings in the store were so high; "[t]hey're monstrous.  There's no way I can determine where it was coming from."  (*Id*. at 205-06.)  As she explained:

> I didn't have the time [to look up].  I was aggravated.  My prescription wasn't ready, my husband was waiting, and I'm not going to stand there and study your ceiling and tell a manager who probably doesn't care anyways that he's got water coming from his roof.  That's how I felt.  I was aggravated that night.

(*Id*. at 206.)  Ms. Fetzer testified that the water covered "at least half" of the width of the aisle.  (*Id*. at 208.)

### B.    Wal-Mart's Safety Measures

According to Wal-Mart, its workers conduct safety sweeps, which involve visually inspecting the floor around their work area for dangerous conditions, such as leaks, drips, and merchandise lying on the ground.  The parties agree that employees working on the sales floor are required to maintain safety in their work area.  With the exception of pharmacy employees who work behind the pharmacy counter and thus are not on the sales floor, associates are responsible for checking the floor in their work areas.

Wal-Mart employees uniformly testified that if an employee discovers water or some other liquid on the floor during one of these safety sweeps, the employee guards the spill, radios for assistance, and places safety cones in the area.[5]  In contrast, Ed Fetzer asserts that on unspecified occasions, he saw employees walk by water on the floor without taking any action. Customer Steven Robinson asserts that on July 24, 2010, he saw an 8-10 inch puddle near the main aisle in front of the pharmacy area that he believed had been formed by water dripping off a ceiling beam.  He estimated that given the speed of the dripping, the puddle "must have been there for a considerable period of time."  (Pl. Ex. 18, Robinson Aff., ¶¶ 15-18.)  He also saw roof leaks in unspecified areas of the store, some of which were marked by cones or "slippery when wet" signs.  On later visits to the store on unspecified dates, Mr. Robinson saw "leaks collecting in buckets or garbage pails" or landing on the floor, some of which were marked by cones or "slippery when wet" signs.  (*Id.* ¶ 36.)

Wal-Mart has adopted standard operating procedures and computer-based training programs to teach associates how to respond and react to spills and dangerous situations on the sales floor.  Management staff also walks around the store to verify that the work areas and floors are clean.

---

[5]  Much of the plaintiffs' effort to dispute this fact lacks any basis in the record.  They appear to believe that if any Wal-Mart employee did not specifically refer to safety cones when describing safety sweeps, they can contest that Wal-Mart had a safety sweep program requiring employees to look for, guard, and either clean up spills or call for help.  *See*, *e.g.*, pharmacy tech Ana Canaki's testimony that "[i] there is something on the floor, you clean it or guard it until someone else comes to clean it up for you, and that's about it."  (Def. Ex. F, Canaki Dep., at 29-30.)  The court also notes that although it struck the affidavit of Daniel Robison, the plaintiffs' architectural expert, his assertion that he did not see a safety sweep during a site visit several years after Ms. Fetzer's fall fails to call Wal-Mart's evidence about its safety program into dispute.

Although pharmacy technician Ana Canaki (whose job apparently does not call for her to work on the sales floor) was unaware of a special program for inclement weather, other Wal-Mart witnesses testified that Wal-Mart has an inclement weather standard procedure that requires staff to set out cones and mats as a preventive measure when the weather is inclement, as shoppers can track in moisture from rain and snow. Store personnel place caution cones at the entrances and exits to bring customer awareness to water or snow that may be on the floor. The procedure requires Wal-Mart personnel to monitor the presence of moisture on the floor during inclement weather.[6]

Several Wal-Mart employees testified that the inclement weather procedure was in effect on March 5, 2013. At her deposition, however, the then-assistant store manager did not believe that the inclement weather procedure was in effect and pharmacy tech Ana Canaki was unaware of any inclement weather protocol. At the time of Ms. Fetzer's fall, the store had floor mats and orange warning cones in the vestibule entrance, as well as near the pharmacy counter.

Wal-Mart's "Towel-in-Pocket" program requires employees assigned to work on the sales floor (as opposed to staff working behind the pharmacy counter) to keep a small absorbent

---

[6] The court takes this opportunity to note again that the plaintiffs' continued practice of citing to non-responsive evidence in support of objections fails to create a genuine issue of material fact (and is also a waste of the court's time, as it must review all of the plaintiffs' largely unresponsive string citations). For example, pharmacist Randy Opland-Reidel's deposition testimony that he does not recall seeing anyone inspect the aisles of the pharmacy department for water on the night of Ms. Fetzer's fall does not create a fact question as to whether Wal-Mart personnel monitors the presence of moisture on the floor during inclement weather. Similarly, Crystal Lake store manager William Wenger's deposition testimony that in inclement weather, staff "put[s] out cones. . . the mats, stuff like that" does not create a question of fact as to whether personnel monitors moisture. (Def. Ex. L, Wenger, Dep., 128.) The court will not comment on further efforts to create a fact question by citing to unresponsive testimony but repeats that it has not considered any such evidence.

towel in their pocket to clean up any spills they see. However, asset protection associate Tiffany Levernier testified at her deposition that she did not carry a towel in the street clothing that she wore as she looked for shoplifters. Instead, she obtained materials to clean up any spills that she discovered. (Def. Ex. K, Levernier Dep., at 100.)

### C. The Roof of the Crystal Lake Wal-Mart

The roof of the Wal-Mart store in Crystal Lake, Illinois, is approximately 200,000 square feet and occasionally leaked. Generally, for small leaks, Wal-Mart employees would set out a bucket to eliminate any splashes, as well as place wet floor signs or cones around the bucket to alert customers and associates of the leak. Wal-Mart's procedures required managers to mark the floor with an "X" to identify the location of roof leaks for contractors. Ed Fetzer and other customers, however, saw standing water from an unknown source or from what they believed to be roof leaks that did not have an "X," a bucket, cones, or signage.

Wal-Mart management is responsible for reporting roof leaks so they can be repaired. To do so, Wal-Mart uses a computer program called "service channel" that allows store personnel to input roof service requests, including roof repairs. Wal-Mart's home office in Arkansas then contacts a contractor who comes out and effects the repairs.

Wal-Mart's corporate representative, Williams Wenger, testified that the Crystal Lake Wal-Mart relied on outside contractors to repair roof leaks. Nevertheless, two field order forms completed by a contractor who effected a repair in 2008 state (without explaining the basis for his opinion about who made the repairs) that he saw two patches "installed by Wal-Mart facilities." (Pls.' Ex. 4, Roof Repair Records, Bates No. 95 at lines 4-5 beneath "Scope of Work"; Bates No. 98 at line 7 beneath "Scope of Work".)

Although Wal-Mart disputes the foundation for a stack of roof repair records for the Crystal Lake store submitted by the plaintiffs, it agrees that to the extent the documents are admissible, they show that a variety of roof repairs were requested and completed. The parties dispute how many leaks were repaired as they disagree about what constitutes a single leak. The parties also dispute when certain roof repairs were effected.

Jason Weisenberger, the manager of the Crystal Lake Wal-Mart in late 2008, was aware of "multiple leaks" located "throughout the store."[7] (Pls. Ex. 11, Weisenberger Dep., at 16-17.) He testified that on unspecified dates, the roof leaked unpredictably in different places; it did not leak consistently from the same locations. Mr. Weisenberger was aware that customers had fallen due to water inside the store "but could not give . . . a specific person or a specific time or whatever, but sure." (*Id*. at 72.) Former assistant store manager Tabatha White believed that leaks were common from the time that it first snowed each year through springtime rains and thought of that time of the year as "leaky season." (Def. Ex. H, White Dep., at 39-40.)

In 2012, store manager William Wenger sent an email to Wal-Mart stating, "I am writing to request to have someone sent out to repair numerous roof leaks that we have in our facility. Can I please get an estimated date? These are causing potential slip and fall hazards." (Def. Ex. L, Wenger Dep., at 106.) Mr. Wenger testified that at this time, he was aware of multiple leaks in unspecified locations.

---

[7] Mr. Weisenberger has had a lengthy career with Wal-Mart, beginning in 1993 when he worked as a stocker. He was the manager of the Crystal Lake Wal-Mart prior to 2008, but at that time, the store was in a different location. The Crystal Lake store where Ms. Fetzer fell opened in October of 2008, and Mr. Weisenberger left at the beginning of 2009 to work at another Wal-Mart, so he was not at the relevant store for a significant period of time.

The plaintiffs submitted claim reports from 41 customers relating to slip and fall incidents in various locations in the store dating back to 2008. (Pls. Ex. 12.) One customer, Natalie Perry, fell in 2011 in the vacuum cleaner department due to what she described as "a puddle of water caused by [the] leaking roof." (*Id.* at H136.)

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

## IV. Discussion

In the plaintiffs' three-count first amended complaint, they allege negligence (Count I), willful and wanton misconduct (Count II), and loss of consortium (Count III). Wal-Mart seeks summary judgment as to all counts. The parties agree that Illinois governs. *See Laye v. Dollar*

*Tree Stores*, No. 10 CV 3714, 2012 WL 246457, at *2 (N.D. Ill. Jan. 26, 2012) (when injury and conduct alleged causing the injury occur in the same state, that state's law generally applies).

## A.      Negligence (Count I)

Wal-Mart argues that it is entitled to summary judgment on the plaintiffs' negligence claim because:  (1) there is no evidence of a dangerous condition; (2) there is no evidence that a dangerous condition proximately caused Ms. Fetzer's injuries, (3) it exercised ordinary care in maintaining its premises in a reasonably safe condition; (4) it did not have actual or constructive notice of any water on the floor in the area where Ms. Fetzer fell; (5) its flooring choice was acceptably slip-resistant, and (6) even if water was on the floor, Ms. Fetzer's contributory negligence is greater than 50% of the proximate cause of her injury so she cannot prevail.

### 1.      Presence of a Dangerous Condition

Wal-Mart contends that it cannot have breached a duty to Ms. Fetzer because no evidence suggests that water was on the floor in the area where Ms. Fetzer fell.  However, at her deposition, Ms. Fetzer testified extensively about her recollection of seeing multiple "perfect circles" of water immediately prior to her fall.  (Def. Ex. D, Mary Fetzer Dep., at 194-95.)  Wal-Mart criticizes Ms. Fetzer's "perfect circles" testimony on various grounds and points to the conflicting testimony of numerous Wal-Mart employees who stated that the floor where Ms. Fetzer fell was dry.  At the summary judgment stage, however, it is well established that the court cannot choose among competing versions of the facts.  *See*, *e.g.*, *Figueroa v. Vill. of Melrose Park*, No. 13-CV-03026, 2015 WL 5139410, at *1 (N.D. Ill. Aug. 31, 2015) (citing *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (when considering a motion for summary judgment, the court "may not assess the credibility of witnesses, choose between

competing inferences, or balance the relative weight of conflicting evidence")).  Accordingly, the court rejects Wal-Mart's contention that no evidence supports an inference that on the day of the incident, there was water on the floor where Ms. Fetzer fell.[8]

### 2.    Proximate Cause

To establish liability under Illinois law, a plaintiff must "prove a causal connection between the injury and the event at issue."  *Lough v. BNSF Ry. Co.*, 988 N.E.2d 1090, 1094-95 (Ill. App. Ct. 2013).  "Evidence of proximate cause must not be contingent, speculative or merely possible, but that there must be such degree of probability as to amount to a reasonable certainty that such causal connection exists."  *Id.* (internal quotations and citations omitted). Thus, proximate cause exists only "when there is a reasonable certainty that the defendant's acts caused the injury."  *Id.*

Wal-Mart argues that it is entitled to summary judgment based on a lack of proximate cause because no evidence suggests that there was a ceiling leak above the aisle where Ms. Fetzer fell.  According to Wal-Mart,  this case, therefore, is a "typical slip and fall premises liability lawsuit involving a spill of water of unknown origin."  (Def.'s Reply, Dkt. 228, at 6.)  In support, Wal-Mart it points to, among other things, the lack of requests for a roof repair near the area of Ms. Fetzer's fall and the testimony of numerous Wal-Mart employees who were unaware of a leak.

---

[8] On a related note, the court notes its disagreement with the plaintiffs' position that Wal-Mart has conceded that the floor was wet when Ms. Fetzer fell.  It is true that Wal-Mart agrees that Ms. Fetzer testified at her deposition that she believed that at least half of the aisle where she fell was covered with "circles of water."  This is not the same thing as agreeing that Ms. Fetzer's recollection was accurate.

Again, however, Ms. Fetzer testified that she heard a drop of water make a sound like a "splat to the floor" and then saw another drop "[come] down from above" and "land[] right near the circles." The drop that Ms. Fetzer saw was "right in front of [her] because [she] saw it land. And it landed in one of the puddles making it go larger." (Def. Ex. D, Mary Fetzer Dep., at 198.) She also testified that she did not look up after she detected the water drops because the ceilings in the store were so high that she could not determine where the water was coming from. Thus, her position that the water came from above is limited to hearing a drop of water hit the floor and seeing a drop of water hit the floor.

For the purposes of Wal-Mart's motion for summary judgment, the court must accept Ms. Fetzer's testimony about these two drops of water. *See*, *e.g.*, *Cheney v. Menard, Inc.*, No. 14-CV-1446, 2016 WL 447419, at *3 (C.D. Ill. Feb. 4, 2016) (denying summary judgment based on the plaintiff's testimony that after she fell, she noticed that her shoe was wet and saw water on the floor). Wal-Mart's position that "[a]t best, Plaintiff's testimony that she heard a splat creates only a mere possibility that there was a ceiling leak, which is cancelled out by the lack of evidence of an actual leak," Def's Memo., Dkt. 233, at 7, is completely inconsistent with the well-established law governing motions for summary judgment, which does not allow the court to cast a vote when the parties present competing evidence. *See Kling v. Menard, Inc.*, No. 13 C 8322, 2015 WL 1607601, at *2-3 (N.D. Ill. Apr. 2, 2015) (when Menard's claimed that the plaintiff slipped on tracked in water, which is not actionable under the natural accumulation doctrine, and the plaintiff asserted that he fell due a freshly mopped up spill, summary judgment was improper).

If a jury was to believe Ms. Fetzer's testimony about the two drops of water coming from above (an issue about which the court expresses no opinion given this case's procedural posture) and reject all of Wal-Mart's evidence about the absence of roof leaks near Ms. Fetzer's fall, it could conclude that the water purportedly falling from above Ms. Fetzer came from the roof. *See Cheney*, 2016 WL 447419, at *4 ("Although the Plaintiff relies on circumstantial evidence she is not speculating as to the cause of her fall. Her unambiguous and firm assertion is that the water pooled near the soda cooler caused her accident.") Certainly, Wal-Mart has not provided any alternative source for water allegedly falling from above or explained where else it could have come from, other than the roof, given the laws of gravity. *See Yager v. ESA 0753, Inc.*, No. 00 C 6068, 2002 WL 924610, at *3 (N.D. Ill. May 3, 2002) (denying summary judgment based on testimony that a ramp pitched downwards and knowledge of "the laws of gravity" because a jury "could conclude that water dripping from the balcony flowed down the ramp to the place where [the plaintiff] slipped"). The plaintiffs have pointed to sufficient evidence to survive Wal-Mart's challenge to proximate cause based on an alleged ceiling leak.

### 3. The Exercise of Ordinary Care

Wal-Mart argues that its safety programs mean that it is entitled to summary judgment because it exercised ordinary care in maintaining its premises in a reasonably safe condition. In response, the plaintiffs contend that Wal-Mart did not consistently carry out its safety programs. They also assert that Wal-Mart is responsible for Ms. Fetzer's fall because it installed an inadequate roofing system, failed to maintain the roof properly, failed to respond to roof leaks adequately, and chose a dangerously slippery flooring material (polished concrete) that became even slippier when wet.

The plaintiffs' claim that a roof leak caused Ms. Fetzer's fall appears to be "both an ordinary negligence cause of action (Wal-Mart caused the dangerous condition) and a premises liability cause of action (Wal-Mart maintained a dangerous condition)." *Reed v. Wal-Mart Stores, Inc.*, 700 N.E.2d 212, 215 (Ill. App. Ct. 1998). This is consistent with the amended complaint (Dkt. 64), which alleges that Wal-Mart created a dangerous condition by failing to maintain the roof of the Crystal Lake store properly and that Wal-Mart is liable based on its failure to address roof leaks adequately.

Wal-Mart's contention that it maintained its premises in a reasonably safe condition by, for example, carrying out safety sweeps does not engage with the plaintiffs' arguments about Wal-Mart's responsibility for the allegedly leaky roof that is at the heart of Ms. Fetzer's suit. It is true that Illinois business owners owe customers "a duty to exercise reasonable care in maintaining their premises in a reasonably safe condition, but are not the ultimate insurers of customers' safety." *Shimkus v. Target Corp.*, No. 10 C 7066, 2012 WL 619500, at *2 (N.D. Ill. Feb. 24, 2012) (citing *Perminas v. Montgomery Ward & Co.*, 328 N.E.2d 290, 293-94 (Ill. 1975)). It is also true that a business owner need not patrol its aisles continuously to search for potential hazards. *Alexander v. Supervalu Inc.*, No. 14 C 3555, 2015 WL 7351693, at *7 (N.D. Ill. Nov. 20, 2015) (collecting cases); *see also Peterson v. Wal-Mart Stores, Inc.*, 241 F.3d 603, 604 (7th Cir. 2001) ("the duty of inspection and clean up does not require continuous patrolling of the aisles"); *Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998) (Wal-Mart need not "patrol the aisles continuously, but only at reasonable intervals").

Nevertheless, a business owner can breach its duty to a business invitee who slips on a foreign substance if, among other things, the invitee establishes that "the substance was placed

there by the negligence of the business." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 649

(7th Cir. 2014). A plaintiff need not show that the defendant had "actual or constructive notice

when she can show the substance was placed on the premises through the defendant's

negligence." *Krebs v. Valley Baptist Church, Inc.*, No. 2-14-0243, 2014 WL 4942337, at \*6 (Ill.

App. Ct. Oct. 1, 2014) (quoting *Reed v. Wal-Mart Stores, Inc.*, 700 N.E.2d 212, 214 (Ill. App. Ct.

1998)).[9]

To create a triable issue of fact with respect to whether a foreign substance is present due

to the owner's negligence, the plaintiffs must first point to evidence "showing that the substance

was more likely placed on the premises through Wal-Mart's negligence rather than a

customer's." *Id.* (citing *Donoho v. O'Connell's, Inc.*, 148 N.E.2d 434, 441 (Ill. 1958)). In

situations involving puddles of liquid, the invitee can carry this burden by showing that the

liquid "was related to the defendant's business" and offering "some further evidence, direct or

circumstantial, however slight, such as the location of the substance or the business practices of

the defendant, from which it could be inferred that it was more likely that defendant or his

servants, rather than a customer, dropped the substance on the premises." *Id.* at 649-50.

Ultimately, to create a triable issue of fact with respect to whether a defendant is responsible for

a substance that led to a fall, a plaintiff must present some evidence showing that the hazard

causing a fall was present due to the action of the store, rather than a customer. *See Piotrowski*

*v. Menard, Inc.*, No. 13 C 5572, 2015 WL 5139415, at \*3 (N.D. Ill. Aug. 31, 2015) (considering

whether Menard's was responsible for a fall caused by rocks taken from a decorative planter

---

[9] Because actual or constructive notice is not always required, the court will not address
the parties' arguments about notice.

outside a store entrance ); *Perez v. Rogers*, No. 2-13-1163, 2014 WL 2918391, at *7 (Ill. App. Ct. June 24, 2014) (summary judgment was properly granted when no evidence suggested that the defendant Village was responsible for a hole near that plaintiff's mailbox that caused her to fall).

The physical condition of the Crystal Lake store is related to Wal-Mart's business. *See Coffee v. Menard, Inc.*, No. 13 C 2726, 2015 WL 1399049, at *4 (N.D. Ill. Mar. 25, 2015) (a merchandise display is related to Menard's business). Although Wal-Mart vigorously disputes that Ms. Fetzer fell due to the presence of water, to the extent that the water dripped down from above as Ms. Fetzer described (an issue which must be decided by a jury), Wal-Mart does not provide an alternative explanation for the water other than a roof leak. Wal-Mart is responsible for the condition of the roof at the Crystal Lake store, and its safety programs do not insulate it from potential liability based on an alleged failure to maintain its roof properly. Thus, Wal-Mart's request for summary judgment based on its safety programs is denied.

### 4.      The Crystal Lake Wal-Mart's Roof

The court next considers the plaintiffs' evidence about other roof leaks or repairs at the Crystal Lake Wal-Mart.[10] In support of their contention that Wal-Mart installed an inadequate roofing system, the plaintiffs rely on Mr. Robison's affidavit, which the court has stricken.

---

[10] The plaintiffs cite to *Wal-Mart Stores, Inc. v. Genflex Roofing, et al.*, No. 09 C 1248 (N.D. Tex. 2008), which the parties refer to as the *Firestone* case as Firestone Building Products was responsible for the allegedly defective roofing system installed at the Wal-Mart store at issue in Rowlett, Texas. The court has already held (in the context of an objection to an order limiting discovery issued by the magistrate judge) that the roofing systems at issue in this case and the *Firestone* case are different. (Dkt. 255). The court declines to revisit this order and will not consider any evidence relating to the *Firestone* case, as it is irrelevant.

Given the absence of any other evidence about the adequacy of the roof installation, Wal-Mart is entitled to summary judgment as to this claim.

The plaintiffs also contend that Wal-Mart failed to maintain the roof properly and failed to respond to roof leaks adequately. "The definition of relevance is broad, encapsulating evidence having 'any tendency' to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fogel v. Bukovic*, No. 11 C 1178, 2011 WL 1706213, at *6 (N.D. Ill. May 5, 2011) (quoting Fed. R. Evid. 401). The court questions the relevancy of leaks outside the pharmacy area or leaks that are not close in time to the date of Ms. Fetzer's fall.

In any event, the court need not address Wal-Mart's numerous challenges to the large stack of roof repair records, the summary chart of those records prepared by plaintiffs' counsel, and evidence about leaks that are temporally removed from Ms. Fetzer's March 2013 fall. This is because some evidence in the record supports an inference that there was a leak in the pharmacy department "shortly before the day" that Ms. Fetzer fell (Def. Ex. H, White Dep., at 205) and the month after Ms. Fetzer's fall (the April 2013 leak from a skylight 25 feet away from the cough and cold aisle). A jury will have to determine what weight to give to evidence relating to other leaks; the court will not exclude them wholesale based on the present record.[11] But Wal-Mart's criticisms of the roof repair records and its arguments about the relevancy of these records do not entitle it to summary judgment as to the plaintiffs' claims about Wal-Mart's roof maintenance and its responses to leaks.

---

[11] This ruling is without prejudice to Wal-Mart's ability to challenge specific items of evidence via a motion in limine.

### 5. The Floor in the Pharmacy Area of the Crystal Lake Wal-Mart

In the interests of streamlining future proceedings, the court briefly comments on the plaintiffs' contention that Wal-Mart chose a dangerously slippery flooring material (polished concrete) that became even slippier when wet. The court struck Mr. Robison's affidavit reflecting his belief that the floor was dangerously slippery. This leaves affidavits from Mr. Fetzer and other Wal-Mart customers. Subjective characterizations about the appearance or slipperiness of a floor are insufficient to establish negligence. *Fultz v. Target Corp.*, No. 14 C 4871, 2016 WL 374141, at *4 (N.D. Ill. Feb. 1, 2016) (collecting cases). That is precisely what the plaintiffs have offered. To the extent that the plaintiffs are claiming that Ms. Fetzer's injury was caused, at least in part, by excessively slippery flooring material, Wal-Mart is entitled to summary judgment.

### 6. Contributory Negligence

Wal-Mart next argues that even assuming arguendo that Ms. Fetzer saw water immediately before she fell, her contributory negligence is more than 50% of the proximate cause of her injury so it is entitled to judgment as a matter of law. In support, Wal-Mart cites to Ms. Fetzer's description of the cough and cold aisle before she fell: she was standing in water up to her feet, the circles were "everywhere" and "in front of [her], to the right, and obviously [she] was standing on them." (Def. Ex. D, Mary Fetzer Dep., at 194-95, 198.) Wal-Mart thus lays at least 50% of the liability for Ms. Fetzer's fall literally at her feet, contending that if it accepts her testimony, she saw but chose to try to step over substantial puddles covering at least half of the cough and cold aisle. In contrast, Ms. Fetzer tacitly concedes that the water she described was an open and obvious danger. (Pls.' Resp., Dkt. 219, at 18-19.) Nevertheless, she contends that

she wandered unknowingly into watery danger because she did not expect Wal-Mart to allow water to accumulate inside and her attention was focused on Wal-Mart's merchandise displays.

In Illinois, a plaintiff cannot recover for negligence if her own contributory negligence (also known as "comparative fault") is more than fifty percent responsible for her injury. 735 Ill. Comp. Stat. § 5/2-116; *Baez v. Target Corp.*, 80 F. Supp. 3d 862, 869 (N.D. Ill. 2015) (a plaintiff cannot recover "if his comparative fault (which is the more apt term than the one used by the parties: 'contributory negligence') is more than 50 percent of the proximate cause of an injury"). Comparative fault exists when a plaintiff "acts without the degree of care that a reasonably prudent person would have used for his own safety under like circumstances, and that action is the proximate cause of his injuries." *Id*. (citing *Coole v. Central Area Recycling*, 893 N.E.2d 303, 309 (Ill. App. Ct. 2008). Contributory negligence is a question of fact that should "rarely" be decided as matter of law. *Id*. (collecting cases).

The parties' arguments about comparative negligence appear to rest on whether the distraction exception to the "open and obvious" rule is applicable. Ms. Fetzer argues that it is, and that the distraction exception diminishes any fault she might have based on her decision to proceed forward after she noticed the circles of water.[12] Under the "open and obvious rule," Wal-Mart "is not required to foresee and protect against an injury if the potentially dangerous condition is open and obvious." *Bruns v. City of Centralia*, 21 N.E.3d 684, 689 (Ill. 2014) (citing *Rexroad v. City of Springfield*, 796 N.E.2d 1040 (Ill. 2003)). As the Illinois Supreme Court has recently clarified, the "distraction" exception to this rule applies when the landowner

---

[12] In this regard, it is unclear if Ms. Fetzer had a choice. She testified both that she saw circles of water in front of her and decided to try to step over them and that she was surrounded by water by the time she noticed she was standing in a puddle.

"has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." *Id.* at 691-92.

Illinois courts have applied the "distraction" exception when a customer walked into a concrete pole outside a K-Mart while carrying a mirror he had just purchased, a worker stumbled into a tire rut at a construction site while exiting a portable restroom because he was looking up since workers had previously thrown objects from a balcony above the restroom, a billboard painter was electrocuted when he attempted to navigate a narrow walkway and could simultaneously look down to avoid falling and look up to avoid a power line, and a high school student fell into a hole in a parking lot while carrying a helmet to the field as instructed by his coach. *Id.* at 692-93 (collecting Illinois cases). Given this authority, the court declines to find, as a matter of law, that Wal-Mart did not expect customers to focus on its merchandise displays while shopping. Indeed, it appears likely that Wal-Mart designed its displays to achieve this very result.

Thus, Ms. Fetzer's account of the circumstances leading to her fall does not rely on a random diversion of attention, such as seeing a friend or the happenstance of looking elsewhere. *See id.* at 693. A jury will have to determine whether the "distraction" exception applies and apportion fault. Wal-Mart's motion for summary judgment based on contributory negligence is denied. And in sum, Wal-Mart's motion for summary judgment as to Count I is granted in part and denied in part as detailed above.

## B. Willful and Wanton Misconduct (Count II)

To establish willful and wanton misconduct, the plaintiffs must show "either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the plaintiff." *Adkins v. Sarah Bush Lincoln Health Ctr.*, 544 N.E.2d 733, 743 (Ill. 1989). Whether a defendant's conduct rises to the level of willful and wanton behavior is usually a fact question. *Estate of Burns v. Williamson*, No. 11-CV-3020, 2015 WL 4465088, at *12 (C.D. Ill. July 21, 2015) (citing *Kirwan v. Lincolnshire-Riverwoods Fire Prot. Dist.*, 811 N.E.2d 1259, 1264 (Ill. App. Ct. 2004)). As the Seventh Circuit has noted, "Illinois case law defining willful and wanton is 'not very helpful'" as the definitions are inconsistent and application of the rule is inherently fact specific. *See id.* (quoting *Fagocki v. Algonquin/Lake-In-The-Hills Fire Prot. Dist.*, 496 F.3d 623, 627 (7th Cir. 2007) (summarizing precedent ranging from a "degree of moral blame attached to intentional harm" to "an utter indifference to or conscious disregard for safety" to "gross negligence" to misconduct that "may be only degrees more than ordinary negligence").

The plaintiffs contend that the record shows that Wal-Mart was aware of multiple roof leaks at the Crystal Lake store for the five years prior to Ms. Fetzer's fall. The court agrees that evidence shows that the roof leaked at various times in various places. In response, Wal-Mart asserts that no evidence suggests that the alleged water that caused Ms. Fetzer's fall was due to a roof leak. However, the court has already rejected this position given Ms. Fetzer's "circles of water" deposition testimony. Wal-Mart also asserts that there is "no evidence of a roof leak above the area where [Ms. Fetzer] fell." (Dkt. 228, Def.'s Reply, at 12.) This is inconsistent with the record, as now-former Assistant Manager Tabatha White testified that there was a leak in the pharmacy department "shortly before the day" that Ms. Fetzer fell. (Def. Ex. H, White

Dep., at 205.)  The present record does not specify what action, if any, Ms. White took regarding this leak or how feasible it would be for the leak to travel to the cough and cold aisle, but it is incorrect to say that "no evidence" supports the plaintiffs' position.

Finally, Wal-Mart points to safety precautions, such as the mats placed to absorb water by entrances pursuant to the inclement weather policy, the "Towel in Pocket" program, and its instructions to associates to monitor their areas.  These precautions are not germane to the plaintiffs' claim that Wal-Mart failed to maintain its roof properly.  According to the plaintiffs, Wal-Mart's practices regarding roof maintenance led to an unacceptably high probability that the roof could spring a leak anywhere and at any time inside the Crystal Lake Wal-Mart and cause a safety hazard to browsing customers.  Wal-Mart's response to this argument is that it had a system in place to report roof leaks and requested repairs when it was informed of a leak.  This creates a question of fact as to the adequacy of Wal-Mart's roof maintenance system.  It does not demonstrate, as a matter of law, that Wal-Mart's practice of responding to known leaks (as opposed to, for example, periodically inspecting the roof) was not willful and wanton.  This is a question for a jury.  Wal-Mart's motion for summary judgment as to Count II is denied.

### C.     Loss of Consortium (Count III)

Wal-Mart has moved for summary judgment on Mr. Fetzer's loss of consortium claim (Count III), arguing that it fails because Ms. Fetzer's claims in Counts I and II fail.  As portions of Count I survive summary judgment and Count II survives in its entirety, Wal-Mart is not entitled to summary judgment as to Count III.

**V.     Conclusion**

For the above reasons, Wal-Mart's motion to strike Mr. Robison's affidavit [216] is granted, Wal-Mart's motions to strike affidavits from customers and Mr. Fetzer [212] and to strike portions of the plaintiffs' Rule 56.1 submissions [214] are granted in part and denied in part, and Wal-Mart's motion for summary judgment [231] is granted as to the portions of Count I detailed in this order but denied as to the remainder of Counts I, II, and III.   This case is set for status on April 15, 2016 at 9:30 a.m., at which time the parties should be prepared to set firm trial and related dates.


Date:   March 1, 2016                          _____/s/_____

                                              Joan B. Gottschall
/cc                                           United States District Judge